FILED
SEP 03 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALOHA DOG AND CAT HOSPITAL,
P.C., et al.,

       Plaintiffs,

                                   CV 08-927-PK

v.                                    FINDINGS AND
                                    RECOMMENDATION

STANDARD RETIREMENT
SERVICES, INC.,

       Defendant.

_____

PAPAK, Judge:

      The plaintiffs are Dr. Douglas Gribskov ("Gribskov"), and his veterinary hospital Aloha

Dog & Cat Hospital, P.C. ("Aloha" (collectively "Plaintiffs")).  In 1985, Plaintiffs started a

retirement plan (the "Plan") for Aloha employees.  Plaintiffs are suing defendant Standard

Retirement Services, Inc. ("SRS") for breach of fiduciary duty under the Employee Retirement

Page 1 - FINDINGS AND RECOMMENDATION

Security Act ("ERISA") 29 U.S.C. §1104, and for breach of contract. This court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

Pending before this court is Standard's Motion for Summary Judgment (#35). For the reasons set forth below, I recommend that the motion be denied with respect to the breach of contract claim and granted with respect to the breach of fiduciary duty claim.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). When considering a motion for summary judgment, the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249; *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.

## FACTS

### A. The Plan and Its Investments

In 1985, when the Plan was created, Gribskov invested and managed the Plan assets himself. In the mid-1990's, Gribskov allowed Charles Wesley Rhodes ("Rhodes") to hold and manage a small portion of the Plan assets.[1] By 2001 or 2002, Rhodes held and was managing a substantial portion of the Plan assets.

Rhodes had been a licensed investment advisor in Oregon until 1999 when Oregon's Department of Consumer and Business Services issued a cease and desist order and assessed a civil penalty against Rhodes for mismanaging investors' funds. (#39, Ex. 8.) In 2006, the SEC filed a complaint against Rhodes and Rhodes Econometrics alleging that Rhodes defrauded

---

[1]Rhodes and Gribskov were also business partners. They opened and co-owned other veterinary clinics beginning in the mid-1990s.

investors. (#39, Ex. 7.) At that time, Plaintiffs learned that over $900,000 was missing from the Plan. In fact, Rhodes never actually invested the Plan's funds in stocks or bond funds as he had represented. Instead, Rhodes had been using the Plan's funds to purchase and restore classic cars.

## B. The Defendant and Its Predecessors

Gribskov initially hired Cascade Pension Services ("Cascade") to provide third-party administrative services for the Plan. Cascade was acquired by Invesmart, Inc. ("Invesmart") in approximately 2000. In January 2007, Invesmart, Inc. merged with SRS which, as the successor entity, is the defendant in this lawsuit.

## C. The Parties' Agreements

For the years prior to 2005, there are no fully integrated writings that set forth all the terms of the agreements between the Plaintiffs and SRS. However, on an annual basis SRS would send Plaintiffs a packet of information out of which the parties' contractual relationship may generally be discerned. The yearly packet of information typically included at least the following: (1) a letter explaining that it is "time to begin the annual administration" for the Plan; (2) an Outline of Administrative Services, which is a one page document listing the services SRS would provide; and (3) the various forms and questionnaires to be filled out by Plaintiffs so SRS could prepare the Plan's annual government filings. (See #39, ¶¶3-9 & Exs. 2-5.)

In the yearly packet dated December 31, 2001[2], SRS's Outline of Administrative Services listed three categories of services it provided to customers: (1) Annual Administration; (2) Ancillary Services; and (3) Extraordinary Administration or Consulting Services. The eight

---

[2]SRS does not dispute that the contents of the yearly packets for Plan Years 2001, 2002 and 2003 were substantially the same. (See, e.g., #37 at ¶¶10-17.)

Annual Administration services are described by SRS as follows:

1.    Computation of the contribution amount by participant, as specified in the Plan

2.    Preparation of year-end allocations of contribution, investment earnings and forfeitures – This includes up to 3 hours for necessary trust accounting and loan recordkeeping to determine the investment earnings for the plan year.

3.    Preparation of a detailed year-end report for management summarizing assets held in the plan and each participant's interest in the plan as of the plan year-end.

4.    Preparation of individual employee benefit statements summarizing activity for the period – This will include each participant's vested percentage and vested amount.

5.    Preparation of the Summary Annual Report required by the Department of Labor

6.    Preparation of annual IRS and DOL Series 5500 filings, including schedules – Up to 2 hours are allotted for preparing these filings.

7.    Calculation of ADP/ACP discrimination tests for employee salary deferral and matching contributions (if applicable); review of coverage, participation and top-heavy status as required by the Internal Revenue Service

8.    Preparation of distribution forms for current-year terminated participants who are entitled to a vested benefit from the plan as of the current plan year end.

(#39, Ex. 2 at 2.)

In January 2005, the parties executed a Retirement Plan Services Agreement (the "2005 Agreement"). (#39, Ex. 6.)  It is a standardized contract generated by SRS outlining the various rights and responsibilities of the parties.  The 2005 Agreement includes a Schedule A which, similar to the above-described December 31, 2001 Outline of Administrative Services, lists the

Page 5 - FINDINGS AND RECOMMENDATION

various Annual Administration services SRS would provide.  Those services are as follows:

- Single calculation of the annual employer contribution in accordance with the Plan document

- Utilization of Plan forfeitures in accordance with the Plan document

- Trust accounting

- Allocation of contributions, investment earnings and forfeitures (if applicable)

- Preparation of a detailed report summarizing assets held in the plan, trust activity and participant account balances

- Preparation of individual participant benefit statements

- Preparation of annual government filings (Form 5500 Series and related schedules) for the Employer to file with the DOL

- Preparation of Coverage Test

- Preparation of Top Heavy Test

- Preparation of Annual Additions Test

- Preparation of the Summary Annual Report required by the Department of Labor

(#39, Ex. 6 at 6.)

Plaintiffs paid SRS a $1,000 annual fee, plus a small amount per Plan member.  This is consistent with SRS's charges for Annual Administration only.  (See, e.g., #39, Ex. 6 at 8.)

**D.  DOL Filings – Qualifying or Non-Qualifying Assets**

For plan years beginning after April 17, 2001, small pension plans (including the Plan) could be exempt from having to engage an independent qualified public accountant ("IQPA") for an annual audit.  In order to escape the IQPA requirement, a small pension plan must either: (1)

be comprised of at least 95% "qualifying plan assets"; or (2) ensure that the person handling the

assets is bonded for at least the full amount of the "non-qualifying assets." *See* 29 C.F.R.

§2520.104-46.  Plans are required to report to the Department of Labor their exemption status

each year in on Schedule I of the Form 5500 series.

In the yearly packet dated December 31, 2001[3], SRS included a one page document

entitled "Important Issues for 2002 Plan Year."  At the bottom of that page, the following

language appears:

> SMALL PLAN AUDIT REGULATIONS
> The Department of Labor (DOL) issued new regulations in 2001 concerning small
> plan asset security for plans with fewer than 100 participants at the beginning of
> the plan year.  These plans are no longer exempt from the audit requirements of
> ERISA Section 103(a)(3)(A) unless at least 95% of the assets in the plan are
> "qualifying assets" or an ERISA bond is in place covering 100% of the value of
> the "non-qualifying" assets.  We will review your plan assets as of the 2001 plan
> year end and advise you of any additional bonding and/or reporting requirements
> necessary.

(#39, Ex. 2 at 3.)

The Plan assets entrusted to Rhodes were "non-qualifying assets" because Rhodes was

not operating: (1) as a bank or similar financial institution; (2) an insurance company qualified to

business under the laws of a state; (3) as a registered broker-dealer under the Securities Exchange

Act of 1934; or (4) as a trustee authorized to act as a trustee for individual retirement accounts

under the Internal Revenue Code.  *See* 29 C.F.R. §2520.104-46.  As a result, for the Plan to be

exempt from the IQPA requirements, Rhodes needed to be bonded for the full amount of the

assets he was handling.  He was not.

---

[3]SRS does not dispute that a similar statement was sent to Plaintiffs on an annual basis
starting in 2001.  (See #44 & 50.)

Beginning in Plan Year 2001, the Form 5500 series included the following question on Schedule I. "Are you claiming a waiver of the annual examination and report of an [IQPA] under 29 CFR 2520.104-46? If no, attach the IQPA's report (See instructions for conditions to be eligible for waiver)." (See, e.g., #46, Ex. 3 at 4, 6, 8, 10, 12 & 14.) Between 2001 and 2006, when SRS prepared this form for the Plan, it claimed the Plan was eligible for the waiver. (Id.) SRS never asked Plaintiffs whether the Plan assets were comprised of at least 95% "qualifying plan assets," or, if not, whether the person handling the assets was bonded for at least the full amount of the "non-qualifying assets." *See* 29 C.F.R. §2520.104-46.

## E. The Plan's Fiduciary Bond

The amount of plan fiduciary bonds are also reported on Schedule I of the Form 5500 series. As noted above, each year SRS sent to Plaintiffs a packet of information which included a questionnaire. For the administration period of January 1, 2002 to December 31, 2002, the questionnaire inquired about the fiduciary bond in place for the Plan and reads as follows:

> ERISA requires that all fiduciaries of any plan that covers any participants other than a 100% owner and/or his spouse must be bonded. This bond must be in an amount equal to at least 10% of the value of plan assets (maximum of $500,000). The bond can typically be obtained through a casualty insurance broker. Please note the plan may be required to obtain a bond in excess of $500,000 if there are any non-qualifying assets held in the plan. Non-Qualifying assets include any asset that is not held by a Bank, Brokerage Firm, Insurance Company or Mutual Fund.

Under that paragraph, Plaintiffs reported that the amount of its bond was $90,000. (#39, Ex. 5 at 7.) The $90,000 bond was reported on Schedule I of the Form 5500 series for a few years. (See #46, Ex. 3 at 4, 6, 8.)

In March 2004, SRS sent Plaintiffs their completed annual report and Form 5500. In the

cover letter, SRS advised Plaintiffs the following about the fiduciary bond:

> The amount of the fiduciary bond should be increased to $100,000, which should equal at least 10% of the assets in the plan. You should security [sic] this bond increase from your property and casualty insurance agent. We have included additional information on this bonding requirement.

(See #36 at 11-12.)

## F. The Plan's Summary Annual Reports

SRS also prepared the Plan's Summary Annual Reports. Small Plans that claim to be exempt from the IQPA requirements must include a statement in their Summary Annual Reports explaining their exemption. For example, for the Plan year ending December 31, 2004, the Summary Annual Report provides:

> The plan has met the requirements to waive the annual examination and report of an independent qualified public accountant. As of the end of the plan year, the following regulated financial institution(s) held or issued plan assets that qualified under the waiver: Charles Schwab Institutional $211,697 and The Rhoades Company $851,329. You have the right to examine or receive from the plan administrator, on request and at no charge, copies of statements from the regulated financial institutions describing the qualifying plan assets.

(#46, Ex. 4 at 4; see also Ex. 4 at 2 & 6 (similar language for different Plan years.)) As explained above, the Plan did not in fact meet the requirements to claim this waiver.

## ANALYSIS

Plaintiffs contend that SRS promised to review the Plan's assets and advise of its fiduciary bonding requirements, and that SRS's failure to do so was a breach of contract. SRS contends it had no such obligation. Plaintiffs also contend that SRS acted as a fiduciary under ERISA. SRS denies it acted as a fiduciary because it performed only ministerial and administrative services for the Plan.

Page 9 - FINDINGS AND RECOMMENDATION

## A. Breach of Contract

"When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). In Oregon, before embarking on a choice of law analysis, a court must first determine whether the laws of the states having a connection with the controversy are in conflict on the particular issue. *Lilienthal v. Kaufman*, 239 Or. 1, 5, 395 P.2d 543 (1964). "The proponent of the law of another forum has the obligation to identify material differences between the applicable law of Oregon and of the other forum." *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295, 301, 157 P.3d 1194 (2007). Here, the parties agree that Oregon law governs their contract dispute. I therefore apply Oregon law.

Construction of a contract is a question of law for the court. *Anderson v. Divito*, 138 Or. App. 703, 908 P.2d 315 (1995). Whether a contract exists is a question of law. *Ken Hood Construction v. Pacific Coast Construction*, 201 Or.App. 568, 577, 120 P.3d 6 (2005), *adh'd to as modified on recons.*, 203 Or.App. 768, 126 P.3d 1254 (2006). Where an alleged contract is contained in various writings, it is the province of the court to construe them to determine if they constitute a contract. *Higgins v. Bonnett*, 282 Or. 725, 728, 580 P.2d 180 (1978). "Oregon subscribes to the objective theory of contracts. In determining whether a contract exists and what its terms are, we examine the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Construction*, 201 Or.App. at 578, 120 P.3d 6 (citation omitted) (emphasis added).

With respect to agreements prior to 2005, SRS contends that Plaintiffs failed to meet their burden of proving by a preponderance of the evidence the existence of a contract and its terms.

(#49 at 2-3.) I disagree. I construe the parties's contractual relationship as an annual service agreement whereby SRS agreed to perform certain third-party administrator functions for the Plan in exchange for an annual fee. The general terms of each annual agreement are those enumerated on the "Outline of Administrative Services" under the heading "Annual Administration" which came in the packet of information sent by SRS to Plaintiffs at the end of each Plan year. Because the parties signed an agreement in 2005, there is no dispute as to that agreement's existence or to its terms.[4] Indeed, as noted previously, with respect to the administrative services provided by SRS, there is little difference between the 2005 Agreement Schedule of Services and the Outline of Administrative Services provided in prior years. Having determined the existence of several year-long agreements, I now construe the disputed provisions of those agreements.

A party is entitled to summary judgment on a contract dispute only if the governing terms of the contract are unambiguous. *Milne v. Milne Construction*, 207 Or. App. 382, 142 P.3d 475, *rev. den.*, 342 Or. 253, 149 P.3d 1212 (2006). Whether a contract is ambiguous is a question of law. *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997). A contract provision is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is capable of more than one plausible and reasonable interpretation. *Batzer*

---

[4]I reject SRS's argument that the integration clause of the 2005 Agreement supersedes all prior agreements and promises and that I may not consider any evidence outside the four corners of the 2005 Agreement. The 2005 Integration clause does not operate to extinguish Plaintiffs' rights under their prior distinct annual agreements. *See, e.g., Security Watch Inc. v. Sentinal Systems, Inc.,* 176 F.3d (6th Cir. 1999). In any event, in assessing whether an ambiguity exists in the terms of an agreement, I may consider extrinsic evidence of the parties' intent under the circumstances under which the agreement is made. *City of Eugene v. Monaco*, 171 Or. App. 681, 687, 17 P.3d 544 (2000), *rev. den.*, 332 Or. 240, 28 P.3d 1175 (2001); see also Or. Rev. Stat. 42.220.

Page 11 - FINDINGS AND RECOMMENDATION

*Construction, Inc. v. Boyer*, 204 Or. App. 309, 313, 129 P.3d 773, *rev. den.*, 341 Or. 366, 143

P.3d 239 (2006). "The threshold to show ambiguity is not high." *Milne*, 207 Or. App. at 388, 142

P.3d 475. Generally, disposition of a contract dispute as a matter of law is not appropriate unless

the meaning of the disputed provisions "is so clear as to preclude doubt by a reasonable person."

*Deerfield Commodities v. Nerco, Inc.*, 72 Or. App. 305, 317, 696 P.2d 1096, *rev. den.*, 299 Or.

314, 702 P.2d 1111 (1985).

      Central to the parties' dispute are the meaning of SRS's promises to: (1) "Prepar[e] annual

IRS and DOL Series 5500 filings, including schedules – Up to 2 hours are allotted for preparing

these filings"[5]; and (2) "Prepar[e] the Summary Annual Report required by the Department of

Labor." According to Plaintiffs, because preparing the Form 5500 Series and Summary Annual

Report necessarily involves making a determination about the qualifying nature of Plan assets

and any fiduciary bond, these two provisions encompass a duty to make those determinations.

      SRS provides a different interpretation of those promises. It contends that the services to

which Plaintiffs subscribed were very basic administration and document preparation services

based on information provided and verified by Plaintiffs. SRS argues it did not have a duty to

conduct an independent investigation of the Plan assets to determine whether they were

qualifying or non-qualifying absent a separate engagement with Plaintiffs for additional services.

      Reading these provisions in the context of the parties' entire agreements as a whole, I

conclude that the agreements are ambiguous with respect to the extent of SRS's duty to determine

whether Plan assets are qualifying or non-qualifying for ERISA purposes. Plaintiff's

---

    [5]The language in the 2005 Agreement differs slightly and reads "Preparation of annual
government filings (Form 5500 Series and related schedules) for the Employer to file with the
DOL."

Page 12 - FINDINGS AND RECOMMENDATION

interpretation is plausible and supported by the circumstances of contract formation each year.
Along with its engagement letter, Outline of Administrative Services, and questionnaires, SRS
also sent Plaintiffs information about changes in the laws. In conjunction with explaining the
IQPA regulations each year SRS stated "we will review your plan assets as of the [] plan year end
and advise you any additional bonding and/or reporting requirements necessary." In addition,
evidence of a prior course of dealing is evidence of the circumstances surrounding formation of a
contract. *Harris v. Warren Family Properties*, LLC., 207 Or. App. 732, 739, 143 P.3d 548, 552
(2006). In years prior to the new regulations (and even continuing after the new regulations were
in effect), SRS did inquire in its questionnaires whether the Plan had a fiduciary bond and asked
in what amount. And at least as would be relevant for Plan years after 2003, SRS did in fact
advise Plaintiffs regarding the amount of fiduciary bond that it ought to have in place. As a
result, it is plausible to interpret the disputed promises as including a duty to determine the
qualifying nature of assets and advise on the appropriate amount of fiduciary bond required for
non-qualifying assets. According to Plaintiffs, these are the types of services that SRS had
provided in the past.

SRS's interpretation of the above-cited provisions is also plausible. For years prior to
2005, SRS's interpretation is supported by the two hour time limitation imposed for preparing the
Form 5500 Series. SRS was providing Plaintiffs with only a basic level of service that did not
involve delving into the nature of the Plan assets. SRS's interpretation is also supported by offers
in the Outline of Administrative Services and 2005 Agreement that additional services could be
provided for additional fees. Although I do not agree with SRS's conclusion that it had no duty
whatsoever to make some sort of determination about the qualifying nature of the assets, the

Page 13 - FINDINGS AND RECOMMENDATION

extent of its duty is not so clear as to preclude doubt by a reasonable person and therefore not

properly resolved by the court on summary judgment. Because I find the agreements to be

ambiguous, summary judgment should not be granted as to the breach of contract claim.

## B. ERISA Fiduciary

ERISA defines a fiduciary as a person who: (1) exercises discretionary authority or

discretionary control over the management of a plan or the management or disposition of its

assets; (2) renders investment advice for a fee or other compensation, direct or indirect, with

respect to any moneys or other property of such plan, or has any authority or responsibility to do

so; or (3) has any discretionary authority or discretionary responsibility in the administration of

such plan. 29 U.S.C. § 1002(21)(A). This is a functional test that turns on the activity, rather

than the title, of the person or entity in question. *See CSA 401(K) Plan v. Pension Prof'ls, Inc.*,

195 F.3d 1135, 1138 (9th Cir. 1999) (noting that actions and not title determine ERISA fiduciary

status); *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997).

Plaintiffs do not assert that SRS exercised discretionary control over the management of

the plan or its assets, or that SRS rendered investment advice for a fee. Plaintiffs argue that SRS

is an ERISA fiduciary, because it "exercised discretionary authority and control respecting the

administration of the Plan each time it (1) undertook to determined [sic] whether Aloha could

waive the annual IQPA report or enhanced bonding requirements, and (2) complete Form 5500

on Aloha's behalf indicating that the Plan qualified for the waiver." (Pl's Br. at 10.)

Plaintiffs' assertions regarding discretionary authority and control arise solely out of

SRS's preparation of the Form 5500 Series and the Summary Annual Report. SRS's role in this

regard was to gather information generated by Plaintiffs and enter the information into forms and

Page 14 - FINDINGS AND RECOMMENDATION

reports.  Third party administrators "are not fiduciaries if they merely perform ministerial

functions."  *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 722 (9th

Cir. 1997).  Preparing forms and reports based on information provided to a third party

administrator are ministerial tasks that do not create fiduciary liability.  *CSA 401(K) Plan*, 195

F.3d, 1135, 1139 (9th Cir. 1999).  Based on the information it received from Plaintiffs, SRS

decided (albeit wrongly) that Plaintiffs were exempt from the IQPA requirements.  However,

"[h]aving to make a decision in the performance of a ministerial duty does not rise to the level of

discretion required to be an ERISA fiduciary."  *Arizona State Carpenters Pension Trust Fund,*

125 F.3d at 722.  Accordingly, SRS was not an ERISA fiduciary, and SRS is entitled to summary

judgment on the fiduciary duty claim.

## CONCLUSION

For the foregoing reasons, Defendant SRS's motion for summary judgment (#35) should

be denied with respect to the breach of contract claim, and should be granted with respect to the

breach of fiduciary duty claim.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any,

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of

the objections.

/

/

/

Page 15 - FINDINGS AND RECOMMENDATION

When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 2nd day of September, 2010.

Honorable Paul Papak
United States Magistrate Judge

Page 16 - FINDINGS AND RECOMMENDATION